UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

IGNACIO LEYBA,

            Petitioner,

    v.

F. FOULK,

            Respondent.

No.  2:13-cv-2341 MCE KJN P

FINDINGS & RECOMMENDATIONS

I.  Introduction

       Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2011 conviction for second degree murder and other charges.  Petitioner was sentenced to 72 years to life in state prison. Petitioner claims that his due process right to a fair trial was violated by the introduction of gang evidence at his trial.  After careful review of the record, this court concludes that the petition should be denied.

II.  Procedural History

       On May 24, 2011, a jury convicted petitioner of second degree murder, attempted premeditated murder, and being a felon in possession of a gun.  The jury also sustained allegations of personal use of a gun resulting in death or great bodily injury.  The jury acquitted

////

1

1  petitioner of witness intimidation.  The trial court imposed an indeterminate term of 72 years to

2  life on the shooting counts and a concurrent term for the gun possession.

3          Petitioner appealed the conviction to the California Court of Appeal, Third Appellate

4  District.  The Court of Appeal affirmed the conviction on July 18, 2012.  (Respondent's Lodged

5  Document ("LD") No. 8.)

6          Petitioner filed a petition for review in the California Supreme Court, which was denied

7  without comment on September 26, 2012.  (LD No. 9.)

8          Petitioner filed the instant petition on November 12, 2013.  (ECF No. 1.)

9  III.  Facts[1]

10          In its unpublished memorandum and opinion affirming petitioner's judgment of

11  conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

12  following factual summary:

13              On a Saturday night in September 2010, defendant and a group of
                friends were at a bar. At last call, they decided to reconvene at the
14              home of one of their number.

15              En route to the residence, defendant and two of the women from the
                group stopped at a neighborhood liquor store. Also at the liquor
16              store were the murder victim, Oquitzin Bravo, the surviving
                shooting victim, Jorge Lopez, and a third friend, all of whom were
17              best friends working together in construction; they originally were
                Mexican natives. They were en route home from a Folsom
18              Boulevard club.

19              As the two shooting victims walked to the door (their third friend
                remaining behind in the car because he was quite drunk), they
20              began conversing with the women, who invited them to the after-
                hours gathering. The two victims returned to their car, and followed
21              the women's car to the home and parked. The gathering was in the
                backyard.
22

23              As the victims and their friend approached the gate to the yard, the
                woman who had invited them suggested that perhaps they all could
24              go elsewhere; victim Lopez said it was up to the women. Defendant
                and his friend, David Goodier, FN1 came up to them. Victim Lopez
25              had noticed them at the liquor store, and now realized they must
                have been there with the women at the same time in a different car.

26

27  _____

[1]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate
    District in <u>People v. Leyba</u>, No. C068671 (July 18, 2012), a copy of which was lodged by
28  respondent as Lodged Document No. 8 on February 25, 2014.

FN1. Goodier, the only Caucasian present, was introduced as "White Boy."

Defendant and Goodier asked whether the group had any gang affiliation. Goodier may have said something to indicate having a gang affiliation. Victim Lopez told them that he and his friends were "pisas" (which he testified as meaning a native Mexican not affiliated with any gang),FN2 and asked if it was acceptable for them to join the gathering. At that point, everyone seemed welcoming to victim Lopez FN3 and the question of gang affiliation did not come up again. Because of his drunken condition, the victims' friend simply sat down near the gate and played with a puppy. Four eyewitnesses described what happened thereafter.

FN2. This term was defined by defendant in his statement to the police as meaning an illegal immigrant. He admitted that he had first noticed them at the liquor store, and found their pisa mannerisms laughable.

FN3. However, defendant asserted in his police statement that he did not like being around people he did not really know.

Victim Lopez testified that he had been talking with a woman from whom he had bought marijuana. He heard a commotion arise; he looked over and saw defendant punching victim Bravo. There were two or three other people around them. Victim Lopez went to victim Bravo's aid. Goodier intercepted him with a punch. Victim Lopez did not recall his other friend being involved in either fight. Victim Lopez heard shots, and ran out the gate toward the front of the house. As victim Lopez reached for his phone to call 911, he saw defendant approach him. Behind him, two people were dragging victim Bravo out of the backyard. Defendant had a gun in his hand. Victim Lopez began to approach victim Bravo; defendant raised his arm and shot victim Lopez, then ran off. Defendant was the only dark-skinned person present other than a pregnant woman, and victim Lopez was certain his shooter was dark-skinned. He had never described defendant as having dreadlocks. His description to the police in English, which is not his primary language, was meant to indicate the shooter's hair was wavy or kinky. After everyone ran off, the victims' other friend emerged from the backyard.

Goodier's girlfriend described the victims and their friend as being in a good mood and bringing beer with them to share. They did not appear at all threatening. One of the victims, who had mentioned he had been a Marine stationed in Iraq,FN4 bought some marijuana from one of the women at the gathering and began to smoke it with her. After coming out of the house with Goodier, defendant's friend Moreno (who lived in the house) walked over to victim Bravo, who was over by the victims' friend near the weight bench. Defendant was there as well. Victim Bravo had appeared to be asking defendant about something; defendant responded by abruptly swinging at him. The girlfriend had not heard any angry words or anything shouted that would explain the onset of the fight. When victim Lopez joined the fray in aid of his friend, Goodier went over to confront him. The brawls split apart; victim Bravo remained

3

engaged with defendant while the other four men moved out of the backyard. There were the sounds of two shots, and smoke came from defendant's hand. Victim Bravo fell to the ground. Defendant ran out of the backyard. Defendant moved toward the other brawl in the front of the house, gun still in hand. Defendant fired the gun at victim Lopez and then ran off. The girlfriend had not seen defendant with a gun beforehand, or seen anyone pass him a gun.

FN4. The girlfriend was unclear in her testimony about the victims' identities, believing the deceased victim involved in fighting defendant was the Marine rather than surviving victim Lopez (who was in fact the ex-Marine). However, in her earlier interview with a detective, she was clear that it was the Marine who was involved in the fight with Goodier.

On the following day, Goodier's girlfriend attended a barbeque that defendant hosted at his home. He did not appear to be acting out of the ordinary in any respect. When the girlfriend asked about the shooting, defendant shrugged and said he had "flipped" because he had not liked victim Bravo asking him about the tattoos on his hands. He had meant only to pistol-whip victim Bravo (which the girlfriend had not observed), but the gun went off; at that point, defendant got mad and shot victim Bravo.

Defendant's friend Moreno had a gun in the house of the same caliber as a casing found out front in the street. Moreno's cohabitant testified that she saw defendant shoot victim Bravo; she heard the victim ask for help, but she ran into the house and did not call for aid. She did not come back out until the paramedics arrived.

The defense called the victims' friend as a witness. He testified that Goodier had beaten him up in the front yard. Goodier also pointed something in his hand at the victims' friend, who could not tell whether it was a knife or gun. He did not recall telling an officer on the morning after that he had moved his head out of the way as Goodier fired a gun twice, or telling him that Goodier had shouted that the Mexicans needed to leave. He had seen victim Lopez dancing with a woman before the fight started. He did not see either shooting. Although he had identified defendant at the time as having been at the liquor store and the house, he did not recognize defendant at trial.

The detective who had conducted the interview testified the victims' friend had recalled that "one of the people seemed to not be pleased that he was there"; that victim Lopez was dancing with a woman, which displeased the dark-skinned man he had previously identified as defendant; that people (including defendant) then attacked victim Lopez, at which point victim Bravo interceded; and that Goodier attacked him with a knife. The victims' friend had not seen any gun, but heard first two shots, then a third. Another officer, who had spoken initially with the victims' friend, told the detective that the victims' friend had said Goodier had a gun. When the detective asked about this, the victims' friend made clear that it was a knife, not a gun. Yet another detective involved in questioning the victims' friend recalled that the latter had described

Goodier as having a knife, not a gun. The victims' friend had also been certain that defendant had not been fighting with victim Bravo. Although he had identified defendant in a photo from liquor store surveillance footage as being at the house, he could not subsequently select defendant's photo in an array.

Defendant did not testify. In his statement to the police, he denied any involvement in the shootings. In the version of events on which he ultimately settled, he claimed that he had been in the bathroom when all the tumult occurred, and fled when he came outside and saw a body on the ground because he did not want any association with whatever had happened.

(People v. Leyba, slip op. at 2-7.)

IV.   Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.   28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 4 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529

5

U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct.  Id.  Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue.  Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[2]  Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams, 529 U.S. at 412.  See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

---

[2]   Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

6

1  'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v.

2  Richter, 131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

3  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

4  must show that the state court's ruling on the claim being presented in federal court was so

5  lacking in justification that there was an error well understood and comprehended in existing law

6  beyond any possibility for fairminded disagreement." Richter, 131 S. Ct. at 786-87.

7          If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

8  court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford,

9  527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

10 (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

11 § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

12 considering de novo the constitutional issues raised.").

13         The court looks to the last reasoned state court decision as the basis for the state court

14 judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

15 If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

16 previous state court decision, this court may consider both decisions to ascertain the reasoning of

17 the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a

18 federal claim has been presented to a state court and the state court has denied relief, it may be

19 presumed that the state court adjudicated the claim on the merits in the absence of any indication

20 or state-law procedural principles to the contrary." Richter, 131 S. Ct. at 784-85. This

21 presumption may be overcome by a showing "there is reason to think some other explanation for

22 the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797,

23 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims

24 but does not expressly address a federal claim, a federal habeas court must presume, subject to

25 rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 133 S. Ct.

26 1088, 1091 (2013).

27 ////

28 ////

V. <u>Petitioner's Claim</u>

Petitioner contends that he was denied his due process right to a fair trial as a result of the admission of gang-related evidence.[3]  Respondent counters that the state court's denial of this claim was neither contrary to, nor an unreasonable application of established Supreme Court precedent, and that the gang evidence was relevant to the identification of petitioner as the perpetrator of the shootings.  (ECF No. 15 at 12-13.)

The last reasoned rejection of petitioner's claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed this claim as follows:

> Before trial, defendant had moved to exclude the evidence of the discussion of gang affiliations. The prosecutor argued the conversation was relevant on the issue of the "comfort level" the victims' group felt in joining in the gathering. Defense counsel asserted that the issue of a concern about being welcome did not require the subject of gang affiliation, which was irrelevant to the offense. The trial court stated that the factual context was too vague at this point to make a definitive ruling, but it was inclined to admit the evidence to explain why victim Lopez felt the need to disclaim gang affiliations, and to give context to what seemed to be otherwise an unprovoked attack.

////

---

[3]  In his direct appeal, petitioner argued that the denial of petitioner's motion to exclude gang evidence was prejudicial error and violated due process.  (LD No. 6.)  On the first page of his habeas filing, petitioner renews his direct appeal claim.  (ECF No. 1 at 1.)  However, on page seven of his petition, petitioner claims that "the prosecutor's misstatement of the material facts to the jury about this being a gang trial that were used to obtain petitioner's conviction was a violation of his due process clause [rights] and rendered his trial fundamentally unfair."  (ECF No. 1 at 7.)  However, throughout his  argument, petitioner's focus is his claim that he was denied his due process right to a fair trial as a result of the admission of gang-related evidence.  Thus, the undersigned does not construe petitioner's claim as an allegation that he suffered prosecutorial misconduct, and notes that petitioner did not exhaust his state court remedies as to a claim of prosecutorial misconduct.  In any event, in light of the strong evidence against petitioner, including two eyewitnesses to his shooting of victim Bravo, and the certainty of victim Lopez that petitioner had shot him (i.e., RT 296), such claim would be unavailing.  See <u>Hein v. Sullivan</u>, 601 F.3d 897, 912-13 (9th Cir. 2010) ("In determining whether a comment rendered a trial constitutionally unfair, factors [courts] may consider are whether the comment misstated the evidence, whether the judge admonished the jury to disregard the comment, whether the comment was invited by defense counsel in . . . summation, whether defense counsel had an adequate opportunity to rebut the comment, the prominence of the comment in the context of the entire trial and the weight of the evidence."), <u>citing</u> <u>Darden v. Wainwright</u>, 477 U.S. 168, 181-82 (1986).

On renewal before trial of the motion to exclude, defense counsel again asserted Goodier's mention of an affiliation was incidental and prejudicial. The prosecution continued to assert that this was relevant to the victims' state of mind and might also have been toward the end of determining whether the interlopers at the gathering were criminally sophisticated. The trial court concluded it was relevant to give context for the interaction between the two groups.

The prosecutor suggested in closing argument that defendant and his cohort, Goodier, were bullies and thugs who intended to victimize what they perceived to be pisas because they were anti-immigrant (though she abjured any burden to establish a motive for the shootings). Towards this end, defendant and Goodier had asked about any gang affiliation. The prosecutor did not in any other respect claim that gang affiliation had anything to do with the shootings.

Defendant contends the trial court abused its discretion in admitting victim Lopez's testimony regarding the inquiry about whether he and his friends had any gang affiliation, and Goodier's vague allusion to his (or his cohorts') gang affiliation. Defendant claims it generated reversible prejudice. We disagree in both respects.

Defendant had evinced scorn for pisas in his interview; learning that victim Lopez and his friends were in fact pisas (in confirmation of defendant's earlier observations of them) would help prove a theory of a premeditated attack on them, though the prosecutor at the close of evidence ultimately abandoned a theory of first degree murder in connection with victim Bravo and conceded defendant had killed rashly. Moreover, as the prosecutor suggested, this inquiry would confirm that the men as pisas (rather than gang members) would be easier prey for any violence if defendant intended to act on this enmity. Victim Lopez's efforts to disavow any connection with a gang would not make sense without Goodier's reference to an affiliation. (See People v. Turner (1994) 8 Cal.4th 137, 189 [challenged statements relevant as context for admissions].) Moreover, defendant denied being the malefactor, and thus proof of motive helped establish his identity as the shooter. (People v. Williams (1997) 16 Cal.4th 153, 193.)

In any event, we do not discern any reversible prejudice from this testimony. It was brief and limited to the subject of a claimed affiliation without any evidence of the nature of gang activity in general or defendant's participation in it. To the extent it might have suggested to the jury that defendant had a criminal disposition, the jury was able to distinguish among the counts regardless of this suggestion (acquitting him of witness intimidation). (People v. Williams (2009) 170 Cal.App.4th 587, 612-613.) The evidence arrayed against him otherwise included two eyewitnesses to his shooting of victim Bravo, and the absolute certainty on victim Lopez's part that defendant had shot him. We are therefore convinced beyond a reasonable doubt that the result would not have been any different in the absence of the gang affiliation evidence.

1   (People v. Leyba, slip op. at 8-10.)

2          "Under AEDPA, even clearly erroneous admissions of evidence that render a trial

3   fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by

4   'clearly established federal law,' as laid out by the Supreme Court."  Holley v. Yarborough, 568

5   F.3d 1091, 1101 (9th Cir. 2009).  The Supreme Court "has not yet made a clear ruling that

6   admission of irrelevant or overtly prejudicial evidence constitutes a due process violation

7   sufficient to warrant issuance of the writ."  Id.  Thus, even if the state appellate court erred in

8   upholding the admission of gang evidence at trial, petitioner would not be entitled to relief, since

9   there is no clearly established Supreme Court law for the state appellate court to contravene.  See

10  id.; accord Pena v. Tilton, 2014 WL 2611147, *1 (9th Cir. June 12, 2014) (rejecting habeas

11  petitioner's due process claim based on the allegedly erroneous admission of gang evidence on

12  the ground that the Supreme Court has never issued a "clear ruling that admission of irrelevant or

13  overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of

14  the writ.") (citing Holley, 568 F.3d at 1101); Nieto v. Lamarque, 410 Fed. Appx. 37, 40 (9th Cir.

15  2010) (refusing to issue a certificate of appealability because there was no clearly established

16  Supreme Court law that "even repeated references to a defendant's gang affiliation can render his

17  trial fundamentally unfair"); see also Briceno v. Scribner, 555 F.3d 1069, 1077-78 (9th Cir. 2009)

18  (claim of denial of due process and a fair trial based on the admission of a gang expert's

19  testimony that crimes in question were gang-related did not contravene federal law), overruled on

20  other grounds by Emery v. Clark, 643 F.3d 1210, 1215 (9th Cir. 2011).  On this basis alone,

21  petitioner's due process claim fails as a matter of law.

22         The cases cited by petitioner are inapposite.  He relies on Berger v. United States, 295

23  U.S. 78 (1935), for the proposition that Berger suffered a violation of his due process right to a

24  fair trial when the prosecution misstated material facts to obtain a conviction.  (ECF No. 1 at 7.)

25  However, Berger is not clearly established Supreme Court law for the purposes of AEDPA

26  because Berger did not involve an interpretation of the Constitution.  Rather, Berger was a direct

27  appeal case in which the Supreme Court was exercising its supervisory power over the federal

28  courts.  See Fry v. Pliler, 551 U.S. 112, 116 (2007) (noting "more forgiving standard of review

10

1   applied to nonconstitutional errors on direct appeal from federal convictions"); United States v.

2   Baugham, 449 F.3d 167, 175 (D.C. Cir. 2006) (explaining that the error in Berger "is perhaps best

3   understood as derived from common law," because "it is not linked to any specific constitutional

4   requirement,").  Supreme Court decisions that are not based on constitutional grounds (e.g., those

5   based on the Court's supervisory powers) are "off the table as far as § 2254(d) is concerned."

6   Early v. Packer, 537 U.S. 3, 10 (2002).

7           But in any event, Berger is distinguishable based on the more frequent and severe

8   prosecutorial misconduct there, including "misstating the facts in his cross-examination of

9   witnesses," "pretending to understand that a witness had said something which he had not said

10  and persistently cross-examining the witness upon that basis," "assuming prejudicial facts not in

11  evidence," "bullying and arguing with witnesses," and generally "conducting himself in a

12  thoroughly indecorous and improper manner."  Id., 295 U.S. at 84.  In Berger, the Supreme Court

13  found that certain statements made by the prosecutor constituted error because they referred to

14  personal knowledge of the prosecuting attorney, in direct contrast to the instant case where the

15  prosecutor's remarks were based on record evidence.

16          Moreover, petitioner's reliance on Ninth Circuit authority issued before AEDPA is

17  similarly unavailing.  For example, petitioner's citation to Mitchell v. Prunty, 107 F.3d 1337 (9th

18  Cir. 1997), overruled on other grounds in Santamaria v. Horsley, 133 F.3d 1242, 1248 (9th Cir.

19  1998), is a pre-AEDPA case.  Such decisions are no longer valid after AEPDA, which now

20  requires that the state court's decision violate clearly established Supreme Court law as a

21  prerequisite for habeas relief.  See Hedlund v. Ryan, 750 F.3d 793, 799 (9th Cir. 2014) ("The

22  'only definitive source of clearly established federal law under AEDPA is the holdings (as

23  opposed to the dicta) of the Supreme Court as of the time of the state court decision.'") (citation

24  omitted).  After AEDPA, the Ninth Circuit has expressly distinguished pre-AEDPA cases on the

25  ground that a habeas petitioner "cannot rely on circuit authority to demonstrate that the right he or

26  she seeks to vindicate is clearly established."  Alberni v. McDaniel, 458 F.3d 860, 864 (9th Cir.

27  2006); accord Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008).

28  ////

In addition, <u>Mitchell</u> is distinguishable.  In <u>Mitchell</u>, the defendant argued and the Court of Appeals agreed that there was insufficient evidence to sustain his conviction, finding that membership in a gang, standing alone, was not proof of intent needed to establish aiding and abetting.  <u>Id.</u> at 1342.  In this case, petitioner does not challenge the sufficiency of the evidence.  Rather, petitioner's claims are predicated on the prejudicial effect resulting from the admission of gang evidence, an issue not addressed in <u>Mitchell</u>.

Here, the prosecution did not charge the underlying crimes as gang-related offenses.  (CT 145.)  Petitioner's sentence was not enhanced by any gang-related allegations.  (CT 274-75.)  However, just because petitioner was not charged with a gang-related enhancement does not preclude admission of any gang evidence.  "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not."  <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 920 (9th Cir. 1991).  In such cases, "we must rely on the jury to sort [the inferences] out in light of the court's instructions."  <u>Id.</u>  Admission of evidence violates due process "[o]nly if there are no permissible inferences the jury may draw" from it.  <u>Id.</u>

Here, the record demonstrates that the gang-related evidence was relevant.  Prior to trial, the trial court heard argument from counsel, initially noting an inclination to defer ruling, but stating that the "the initial interaction between these groups is . . . pretty relevant to understand the dynamic that was going on in that backyard."  (Reporter's Transcript ("RT") 26.)  Later, the trial court stated: "And it, in my view, is relevant to explain the victims' subsequent actions and their interaction with the parties.  And so I think probably on balance, . . . it's substantially more probative than it is prejudicial.  There's no gang enhancement charged in this case.  And it's my understanding the People are not going to be establishing that [petitioner] is a validated member of the Nortenos are you?"  The prosecution responded, "No."  (RT 29.)  The trial court indicated it would be willing to give the jury a limiting instruction concerning the gang evidence.  (RT 32.)  The trial court was careful to develop the record before ruling.  (RT 26, 57.)  For example, the court asked the prosecution to contact the investigator to ask Mr. Lopez specific questions during a call where defense counsel and the prosecution were present.  (RT 57-58.)  After hearing from counsel concerning Mr. Lopez' current recollection, the trial court reaffirmed its prior ruling, and

12

1  found that the evidence was "very probative on motive and understanding the basis from which

2  this trial emanates." (RT 63.)  In addition, the jury was provided a limiting instruction:

3
> You have heard testimony that the subject of gangs was discussed
> when Jorge Lopez first arrived at the 47th Avenue residence.  You
4  > are the sole judges as to whether gangs were discussed, what was
> said, who may have heard these comments, and the significance of
5  > such evidence.

6  (Clerk's Transcript ("CT") 162.)

7       Thus, the gang-related evidence was relevant to provide context for the interaction

8  between the two groups prior to the shooting, and arguably to demonstrate motive and petitioner's

9  state of mind.

10      Moreover, the state court reasonably found that the gang evidence was not prejudicial.

11  The gang reference during the case in chief was limited and very brief.[4]  During direct

12  examination, Jorge Lopez was asked to describe his conversation with the petitioner and a white

13  guy with tattoos when Jorge Lopez and his friends were trying to determine if they were really

14  welcome at the party.  (RT 272-74.)

15       Q:  And what are they asking you?

16       A:  . . . Oquis[5] was right there too and Orlando we were together.
         They were asking if we were Norteno.
17

       Q:  Okay.  And do you recall today who asked you that?
18

19       A:  The guy that . . . shot me and also the white guy both, you
         know, asking us.

20       Q:  Okay. . . .

21       . . .

22       Q:  Okay.  And how did you respond to them?

23       A:  We told them that, you know, we were Pisas.

24       . . .

25       Q:  What else did you tell them?

26  _____
[4] Jorge Lopez testified on May 12, 2011.  (RT 250-382.)

27
[5] "Oquis" was the nickname of victim Oquitzin Bravo.  Jorge Lopez, Bravo, and Orlando were
28  best friends stopped at the liquor store, where they met the women friends of petitioner.

1    A:  That we were . . . just having a good time and we didn't mean
2    no harm.

. . .

3    Q:  Okay.  Did you know what a Norteno was?

4    A:  Yes.

5    Q:  And in your mind what was a Norteno when they asked you
6    that?

7    A:  They're a gang member.

8    Q:  And can you tell me you used the term "Pisas," what's that
     mean to you?  What were you telling them?
9
     A:  I working Mexican.
10
     Q:  And working Mexicans from Mexico?
11
     A:  Yes.
12
     Q:  Originally from Mexico?
13
     A:  Yes.
14
     Q:  Not born in the United States?
15
     A:  No.
16
     Q:  Okay.  So once you said you were Pisas and you didn't mean
17   them any harm, was there any other discussion about Norteno,
     Surenos, anything gang related?
18
     A:  After that, no.
19
     Q:  And so do you have any recollection today of the white guy
20   telling you he was a northern?
21   A:  I remember I think so.  I be honest I'm not really sure but I
     think he made it clear in a way that he was.
22
     Q:  He did something or said something --
23
     A:  Yes.
24
     Q:  -- to make you think that?  And you're not sure today?
25
     A:  No, ma'am.
26
     Q:  Okay.  So, once you explained you're a Pisas, did you also
27   explain you weren't gang affiliated?
28   A:  Yes, we did.

14

Q:  How did you say that to --

A:  I mentioned again that if they wanted us to leave we could leave, there was no problem with us leaving.

Q:  Okay.  And then --

. . .

A:  And after that, then it was everything was okay.  They didn't mention that again and they even brought out, you know, music.

(RT 274-76.)  Jorge Lopez offered no further testimony concerning gangs or Nortenos during the remainder of his testimony, and defense counsel did not cross-examine Lopez on the issue.  (RT 277-382.)  Petitioner testified that he did not recall seeing tattoos on petitioner, the shooter.  (RT 373-74.)

Similarly, the prosecution's reference to the gang evidence in closing arguments was also brief.  The prosecution did paint petitioner and his friends at the party as thugs, and argued the vulnerability of the victims based on their undocumented alien or "Pisas" status.  (RT 861-62.)  After noting that the Pisas arrived at the Moreno's, the prosecutor stated:  "Immediately they're questioned.  What are you?  Where are you from?  Norteno?  Surenos?  Goodier mentioned Norteno."  (RT 862.)  No further argument was made concerning the specific gang reference.  (RT 843-909; 947-58.)  In addition, the jury was instructed that "[n]othing the attorneys say is evidence," and that their remarks during opening and closing arguments are not evidence.  (CT 157.)

Here, the gang references at trial were very brief and limited to claimed gang affiliation rather than the nature of gang activity or petitioner's role in a gang, if any.  Moreover, in light of the strong evidence against petitioner, including Jorge Lopez' certain testimony that petitioner shot him, the admission of such gang evidence was not prejudicial.

Accordingly, the state court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court authority.

////

////

////

15

1   VI.  <u>Conclusion</u>

2          IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas

3   corpus be denied.

4          These findings and recommendations are submitted to the United States District Judge

5   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

6   after being served with these findings and recommendations, any party may file written

7   objections with the court and serve a copy on all parties.  Such a document should be captioned

8   "Objections to Magistrate Judge's Findings and Recommendations."   If petitioner files

9   objections, he shall also address whether a certificate of appealability should issue and, if so, why

10  and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if

11  the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

12  § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

13  service of the objections.  The parties are advised that failure to file objections within the

14  specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

15  F.2d 1153 (9th Cir. 1991).

16  Dated:  October 17, 2014

17

18  leyb2341.157                          KENDALL J. NEWMAN
                                         UNITED STATES MAGISTRATE JUDGE
19

20

21

22

23

24

25

26

27

28

                                   16